No. 92-480

IN THE SUPREME COURT OF THE STATE OF MONTANA

1994

STATE OF MONTANA, ex rel.,
FARM CREDIT BANK OF SPOKANE,

     Relator,

   v.

THE DISTRICT COURT OF THE THIRD JUDICIAL
DISTRICT OF THE STATE OF MONTANA, IN AND
FOR THE COUNTY OF POWELL, and the
Honorable Judge thereof, TED L. MIZNER,

     Respondents.

FILED

AUG 12 1994

Ed Smith
CLERK OF SUPREME COURT
STATE OF MONTANA

ORIGINAL PROCEEDING

COUNSEL OF RECORD:

    For Relator:

        Martin S. King, Worden, Thane & Haines, Missoula,
        Montana (argued); W. Arthur Graham, Central Coast
        Farm Credit, Arroyo Grande, California

    For Respondents:

        Allen Beck, Attorney at Law, Billings,
        Montana (argued); Peter Pauly, Attorney at Law,
        Helena, Montana (for Clifford and Patricia Graveley)

Submitted: November 5, 1993

Decided: August 12, 1994

Filed:

Clerk

Justice Terry N. Trieweiler delivered the opinion of the Court.

Plaintiffs Clifford E. Graveley and Patricia E. Graveley filed their complaint in the District Court for the Third Judicial District in Powell County claiming the right to damages from defendant Farm Credit Bank of Spokane (FCB) based on numerous allegations, including breach of contract and breach of the Bank's independent covenant to perform that contract in good faith. The Graveleys sought contract damages and specific performance of what they alleged were the Bank's obligations pursuant to the contract. The Bank denied the Graveleys' allegations and counterclaimed to foreclose the real estate mortgage that had been given by the Graveleys to the Bank as security for a promissory note executed by the Graveleys and the Bank on April 6, 1984. The FCB also sought a deficiency judgment in the event the land which secured the Graveleys loan was sold for less than the amount of the Bank's judgment. The FCB moved for summary judgment in its favor on its foreclosure action and to dismiss the claims in the Graveleys' complaint.

The District Court denied the FCB's motion because: (1) it concluded that there were genuine issues of fact raised by the Graveleys' affirmative defense based on equitable estoppel; and (2) it concluded that there were issues of fact raised by the Graveleys' affirmative defense based on the Bank's alleged failure to comply with the Agricultural Credit Act of 1987.

Since the issues decided by the court, pursuant to the FCB's motion for summary judgment, were issues of first impression in

2

Montana, and in the interest of judicial economy, the District Court joined counsel for both parties in their request that we grant supervisory control to review the legal issues decided by the District Court.

> The Supreme Court of this state is given general supervisory control over all of the state courts. Art. VII, § 2(2), Mont. Const. Our Rule 17(a), Montana Rules of Appellate Procedure, recognizes that the institution of original proceedings in the Supreme Court is sometimes justified by circumstances of an emergency nature, when supervision of a trial court other than by appeal is deemed necessary or proper.

*State ex rel. Racicot v. District Court* (1990), 244 Mont. 521, 524, 798 P.2d 1004, 1006.

In this case, final resolution of the legal issues presented is necessary in order to assure that any subsequent trial is based on the true legal merits of the complaint and counterclaim, and thereby, to avoid needless and expensive litigation based on uncertainty about the controlling law. We have, in the past, held that this is a sufficient basis for granting supervisory control, and therefore, accept supervisory control in this case. *First Bank System v. District Court* (1989), 240 Mont. 77, 782 P.2d 1260. After considering the arguments of the parties, we affirm in part and reverse in part.

The District Court's order, the petition for supervisory control, and the briefs of the parties present the following issues for our consideration:

1. When provisions of the Agricultural Credit Act of 1987 found at 12 U.S.C. § 2202a (1988) are included by reference as

3

terms in a mortgage agreement, can a party to the agreement sue to enforce those provisions in district court?

2. Can an allegation that a Farm Credit Bank failed to comply with the restructure provisions of the Agricultural Credit Act of 1987 found at 12 U.S.C. § 2202a (1988) provide an affirmative defense to a foreclosure action by that bank?

3. Can unilateral representations allegedly made by the lender and upon which a borrower relies to his detriment provide a basis for the affirmative defense of equitable estoppel to a foreclosure action when those representations are verbal and not included in the parties' written agreement?

4. Are the plaintiffs entitled to a jury trial of the issues remaining after resolution of the three previous issues?

### FACTUAL BACKGROUND

This factually complex litigation was commenced by the Graveleys' complaint filed on March 17, 1987. Since then, extensive discovery has been completed, numerous depositions taken, and several lengthy affidavits filed, both in support of and in opposition to the FCB's motion for summary judgment. The following summary necessarily omits many facts which may ultimately be important to the resolution of this claim on its merits. They are provided in summary form to illustrate the nature of the claim and counterclaim, and the basis for this opinion. Furthermore, since we are reviewing an opinion and order partly denying and partly granting summary judgment, we also review the facts most favorably

4

to the Graveleys, who are the nonmoving parties. Where conflicts have been established, we will attempt to note them.

The Graveleys are cattle ranchers who have operated on a 4000 to 5000 acre piece of land known as the "Home Place" since 1934, and whose family has owned that piece of property since 1940. That land has never been encumbered and was not encumbered as part of the loan which is the subject of this lawsuit.

In 1963, the Graveleys added to their ranching operation by purchasing the "Garrison Place" which consisted of approximately 5000 acres and was located about 12 miles away from the "Home Place." By 1984, the balance due on the loan with which the Garrison Place was purchased was under $25,000, and the Graveleys estimated its value at $1,000,000.

The Graveleys have three sons and wanted to expand their ranching operation so that their sons could participate and so that it could support more than one family. That opportunity presented itself in 1983 when an area of pasture land known as the "Snowshoe Place," which consisted of 3240 acres came on the market. The price of the Snowshoe Place was $673,920.

In order to purchase the Snowshoe Place, the Graveleys approached Valerie Warehime, a loan officer at what was then the Federal Land Bank of Spokane and has since been reorganized and renamed Farm Credit Bank of Spokane.

The Graveleys requested a loan of $770,000 in order to purchase the Snowshoe Place, pay off the balance due on the Garrison Place, and pay for the lease of additional federal land.

5

As part of its review of the loan application, the Bank appraised the Garrison Place at a value of $690,000, and the Snowshoe Place at a value of $600,000. Therefore, in order to secure a loan in the amount requested by the Graveleys, the FCB demanded a mortgage interest in both pieces of property. Up to this point, the parties are in agreement.

Both Mr. and Mrs. Graveley have testified by deposition or affidavit that they did not need to expand their ranching operation and did not wish to do so if the Home Place, which had been in their family for several generations, would in any way be jeopardized. They state that they requested and received assurances from Valerie Warehime that the loan was feasible without encumbering the Home Place, and that it would not otherwise be at risk, regardless of their ability to repay the loan. The Graveleys have testified that they were told by Warehime that in the event they were unable to make payments on the loan, they could simply give FCB deeds to the secured property in lieu of foreclosure proceedings, and that "that would be the end of it." They state that they were repeatedly advised by Warehime that the Garrison and Snowshoe Places were sufficient to secure the loan. In fact, based on the Bank's appraisal of the two secured properties, the loan at that time represented only 59 percent of the land's value.

Warehime acknowledges that at the time the loan negotiations were conducted, the Graveleys were concerned about neither encumbering nor endangering the Home Place and admits believing that the security provided by the other two parcels of land was

6

sufficient in the event of default. However, she denies making any representations about the safety of the Home Place, or that the Bank would accept a deed in lieu of foreclosure in the event of default.

On April 6, 1984, the Graveleys signed a promissory note in which they acknowledged borrowing, and agreed to repay, the amount of $770,000 to the FCB in 35 annual installments at a variable rate of interest. The installments were due on the first day of January of each year, beginning in 1985. The initial interest rate was 11.75 percent, but could vary based on the provisions of the Farm Credit Act of 1971 (12 U.S.C. §§ 2001, *et seq.*) and the regulations of the Farm Credit Administration. In the event of default, the FCB retained the right to accelerate the loan, declare the entire balance due, and increase the interest rate by an annual rate of two percentage points.

On that same date, the Graveleys executed a written mortgage agreement which gave the FCB a security interest in both the Snowshoe Place and the Garrison Place to secure performance of the promissory note. The mortgage agreement did not provide for a deed in lieu of foreclosure in the event of default. However, it did include the following term:

> This mortgage and the note secured hereby are executed and delivered under and in accordance with the Farm Credit Act of 1971 and any Acts amendatory or supplementary thereto and the regulations of the Farm Credit Administration, and are subject to the terms, conditions and provisions thereof applicable to Federal Land Bank loans.

7

The Graveleys made their first annual installment in the amount of $64,789.74 on December 30, 1984. However, during the following year, the Graveleys experienced numerous problems which made it impossible to make the payment due on January 1, 1986. Due to drought, their hay crop was inadequate for their needs; due to disease, a large number of their cattle died; and their operating loan which they had received from another lending institution was not extended as it had been in the past, but they were required to pay the entire balance in 1985. This required that all the proceeds from the sale of their cattle in 1985 be applied to the payment of their operating loan.

Clifford Graveley testified that when he realized he would be unable to make the second annual installment on his loan with the FCB, he met with Warehime in December 1985 to advise her of that fact and tendered the property which had secured his loan in lieu of foreclosure. It was his opinion at that time that the value of the Garrison Place itself exceeded the balance due on the loan. He states that Warehime told him the Bank did not want the deeds at that time, but would prefer that he try to sell the Garrison Place himself. She suggested that they enter into a written agreement extending the January 1 due date to July 1, 1986. It is Warehime's recollection that prior to the due date of the second annual installment, the Graveleys offered the Garrison Place in lieu of foreclosure, but not both secured properties, and that the Garrison Place was not sufficient to satisfy the amount due on the note. She agrees that she advised him the Bank was not interested in a

8

deed in lieu of foreclosure at that time, that she suggested that he try to sell the property, and that they enter into an extension agreement.

Warehime acknowledged that in 1986 the Bank did have a policy which allowed it to accept a deed in lieu of foreclosure under some circumstances. However, the Graveleys did not meet the criteria for such an exchange because they had sufficient unsecured property that the Bank was confident it could collect its deficiency after foreclosure, even if the collateral was inadequate to cover the loan.

Apparently agricultural land values in the area began to decline in 1986. However, on March 31, 1986, a loan examiner at the Bank estimated the combined value of the secured properties had declined to $980,000, and the balance due on the Graveleys' loan was $847,409. In other words, the balance due was still only 86.5 percent of the properties' appraised value.

By July 1, 1986, the Graveleys had still been unable to sell the Garrison Place, and by October 23, 1986, the combined value of the two secured properties had declined to $560,000. No further appraisals have been done since that time.

On the other hand, the Graveleys' debt obligation has substantially increased since 1986. The promissory note was accelerated in January 1987 and at that time the interest rate on the unpaid balance was increased to 14.25 percent. By the time the Bank filed its counterclaim for foreclosure, it claimed a total amount due of $950,602, with interest accruing at the rate of 14.25

percent annually. By the time of its motion for summary judgment on November 5, 1987, the Bank claimed that the balance of the accelerated amount due was $1,013,463.24, nearly twice the most recent estimated value of the property held as security. The Bank also sought a deficiency judgment, which would presumably be collected by execution on the Graveleys' Home Place.

The Graveleys contend that they only went ahead with the loan because they were repeatedly advised by Warehime that the Garrison and Snowshoe Places were sufficient to secure the loan, that their Home Place would never be placed in jeopardy, and that the Bank would take a deed in lieu of foreclosure in the event they were unable to make loan payments. They contend that they did not need the loan and would not have taken the loan without these assurances, but that in spite of these assurances, the Bank refused to accept deeds in lieu of foreclosure, and they now find themselves in danger of losing their home.

In their original complaint against the FCB, the Graveleys alleged, among other things, that the Bank's representations to them regarding the adequacy of their collateral breached the Bank's covenant of good faith and fair dealing, and sought specific performance of the Bank's agreement to take a deed in lieu of foreclosure. In reply to the Bank's counterclaim for foreclosure, the Graveleys admitted executing the loan documents, but set forth numerous affirmative defenses, including actual and constructive fraud, breach of the covenant of good faith, breach of contract,

equitable estoppel, and violation of statutory duties under the Agricultural Credit Act of 1971.

Subsequent to the original pleading in this case, the Farm Credit Act of 1971 was amended by the enactment of the Agricultural Credit Act of 1987 which became effective January 6, 1988. Agricultural Credit Act of 1987, Pub. L. 100-233, title I, § 102(a), 101 Stat. 1574 (codified at 12 U.S.C. § 2202a (1988)). Among the Act's provisions was the provision at § 2202a(e) that:

> If a qualified lender determines that the potential cost to such qualified lender of restructuring the loan in accordance with a proposed restructuring plan is less than or equal to the potential cost of foreclosure, the qualified lender shall restructure the loan in accordance with the plan.

On February 18, 1988, pursuant to the new statute, the FCB notified the Graveleys that it would consider an application for restructuring their loan under the new Act. On March 31, 1988, within the time allowed, the Graveleys submitted an application for restructuring, which was denied by the FCB's loan officer on July 18, 1988. Pursuant to the provisions of the new Act, the Graveleys then requested and received review of the loan officer's decision by a credit review committee. The committee affirmed the denial on September 19, 1989.

On August 24, 1989, the Graveleys filed an amendment to their complaint which set forth the history of their application for restructuring and alleged that the FCB's denial of their application was contrary to the provisions of the 1987 Act, and therefore, breached the terms of the contract between the parties which incorporated that Act by reference. They added that the

11

Bank's refusal to restructure was an additional example of its breach of the covenant of good faith and fair dealing, and also sought specific performance of the contractual agreement to restructure.

The District Court's disposition of these claims, counterclaims, and affirmative defenses was as set forth above.

## STANDARD OF REVIEW

This Court reviews an order of summary judgment by utilizing the same criteria used by a District Court initially under Rule 56, M.R.Civ.P., *Minnie v. City of Roundup* (1993), 257 Mont. 429, 849 P.2d 212. Pursuant to Rule 56(c), summary judgment is proper when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law.

## I
## BREACH OF CONTRACT CLAIM

When provisions of the Agricultural Credit Act of 1987 found at 12 U.S.C. § 2202a (1988) are included by reference as terms in a mortgage agreement, can a party to the agreement sue to enforce those provisions in district court?

The credit transaction which gave rise to this litigation was made possible by the Farm Credit System, which is governed by the Farm Credit Act of 1971, as amended. 12 U.S.C. §§ 2001, *et seq.*

The part of this legislation with which the first issue is concerned resulted from amendments to the Farm Credit Act of 1971 which are found in part at 12 U.S.C. § 2202a, and which provide for the restructure of distressed loans. Some courts have held that those amendment were for the benefit of the lending institutions

12

involved in the Farm Credit System and to minimize the possible exposure of the federal budget. *See, e.g., Harper v. Federal Land Bank of Spokane* (9th Cir. 1989), 878 F.2d 1172, 1174-75, *cert. denied* (1990), 493 U.S. 1057, 110 S. Ct. 867, 107 L. Ed. 2d 951. However, resolutions of the United States Congress which preceded enactment of the amendments, indicate that Congress was equally or more concerned with providing borrowers who faced unusual financial difficulties additional time to resolve their problems through forbearance and restructuring programs which were consistent with maintaining a viable credit delivery system. *See* H.Con.Res. 310, May 14, 1986, and S.Con.Res. 138, May 14, 1986.

While the 1987 amendments were wide ranging, the particular amendment with which this case is concerned is found at 12 U.S.C. § 2202a and provided for restructuring distressed loans.

Under the terms of the Act, a distressed loan is any loan that the borrower does not have the financial capacity to pay according to its terms, has become delinquent under the terms of the loan agreement, and which presents a high probability of loss to the lender. 12 U.S.C. § 2202a(a)(3) (1988). Both of the parties in this case agree that by February 1988, the Graveleys' loan with the FCB was "distressed."

Under the Act, restructuring includes:

[R]escheduling, reamortization, renewal, deferral of principal or interest, monetary concessions, and the taking of any other action to modify the terms of, or forbear on, a loan in any way that will make it probable that the operations of the borrower will become financially viable.

13

12 U.S.C. § 2202a(a)(7) (1988).

The source of the parties' disagreement in this case over the 1987 Act is § 2202a(e). That section sets forth the circumstances under which restructuring should be permitted. It provides as follows:

> If a qualified lender determines that the potential cost to such qualified lender of restructuring the loan in accordance with a proposed restructuring plan is less than or equal to the potential cost of foreclosure, the qualified lender shall restructure the loan in accordance with the plan.

It is the Graveleys' contention that these provisions for restructuring distressed loans became terms of their mortgage agreement with the FCB by reference when that agreement provided that:

> This mortgage and the note secured hereby are executed and delivered under and in accordance with the Farm Credit Act of 1971 and any acts amendatory or supplementary thereto and the regulations of the Farm Credit Administration, and are subject to the terms, conditions and provisions thereof applicable to the Federal Land Bank loans.

In opposition to the FCB's motion for summary judgment, the Graveleys submitted the affidavits of David K. Johnson and Tim J. Watts. Johnson stated that he was a certified public accountant in Helena who assisted the Graveleys in the preparation of their application for restructure of their loan. As part of that application, he determined the cost of foreclosure and the cost of restructure according to the standards provided for in the Act, and concluded that based on the terms of the Act, restructuring would clearly cost less than foreclosure. It was, in fact, his opinion as an accountant who had worked on a number of loan restructure

14

applications, that the Graveleys' application possessed the highest probability of success of all of those that he had worked on.

Watts is an agricultural economist who specializes in the development of financial alternatives for distressed agricultural firms. He stated in his affidavit that in that capacity he has developed restructuring alternatives for approximately 300 farms and ranches. He was retained on behalf of the Graveleys to analyze the FCB's decision to deny their application for restructure of their loan. He stated that his analysis did not involve a substitution of his judgment for that of Valerie Warehime, but that using the Bank's own work sheets, and applying correct mathematical calculations and values, he concluded that her calculations were incorrect. He expressed the opinion that using correct figures and including the correct expenses of foreclosure, the net benefit of restructuring was $23,347 greater than the net benefit of foreclosure, even if it was assumed that the Bank had a right to a deficiency judgment. If, based on the affirmative defense of collateral estoppel there was no right to deficiency judgment, then the financial advantage to the Bank by restructuring the Graveleys' loan would be $373,078.60, according to Watts.

Under 12 U.S.C. § 2202, a board of directors of a lender like the FCB can establish a credit review committee which includes farmer representation. It further provides that within seven days after receiving notice from the lender that an application for restructuring has been denied, a borrower may obtain review of that decision before the credit review committee. As mentioned

15

previously, review was requested of the Graveleys' restructure application, and the lender's decision to deny restructure was affirmed by the credit review committee.

Judicial review is neither expressly provided for nor prohibited by the terms of the Agricultural Credit Act of 1987. However, FCB argues that pursuant to 12 C.F.R. § 614.4443(d) (1992) the decision of the credit review committee is final under federal law and that pursuant to numerous federal and state decisions, there is no private right of action to enforce the provisions of the Act.

First, we note that § 614.4443(d) was not in effect on the date application for review was made. Second, the provision relied on by FCB merely provides that the credit review committee's decision "shall be the final decision of the lender." (Emphasis added). It makes no reference to what other remedies may or may not be available to enforce the provisions of the Act.

Third, none of the federal decisions relied on by the FCB involve a claim that the terms of the Act were incorporated by reference in a contract and that by failing to comply with the terms of the Act, a lender breached the terms of its contract with the borrower. *See Smith v. Russellville Production Credit Ass'n* (11th Cir. 1985), 777 F.2d 1544; *Harper*, 878 F.2d 1172; *Farm Credit Bank of Spokane v. Debuf* (D. Mont. 1990), 757 F. Supp. 1106; *Griffin v. Federal Land Bank of Wichita* (10th Cir. 1990), 902 F.2d 22; *Zajack v. Federal Land Bank of St. Paul* (8th Cir. 1990), 909 F.2d 1181; *Saltzman v. Farm Credit Services* (7th Cir. 1991), 950 F.2d 466. Furthermore, none of the state authorities cited by

16

FCB deal with an action based on breach of contract, with the exception of one intermediate appellate court decision from the State of Minnesota. *See Yoest v. Farm Credit Bank of St. Louis* (Mo. App. W.D. 1992), 832 S.W.2d 325; *Sierra Bay Federal Land Bank Ass'n v. Superior Court* (1991), 227 Cal. App. 3d 318, 277 Cal. Rptr. 753; *Federal Land Bank of Omaha v. Woods* (Iowa 1991), 480 N.W.2d 61; *Interstate Production Credit Ass'n v. MacHugh* (Wash. App. 1991), 810 P.2d 535; *Federal Land Bank of Spokane v. Wright* (Idaho App. 1991), 813 P.2d 371; *Production Credit Ass'n of Fargo v. Ista* (N.D. 1990), 451 N.W.2d 118; *Production Credit Ass'n of Worthington v. Van Iperen* (Minn. App. 1986), 396 N.W.2d 35. The *Van Iperen* decision, which does deal with a claim based on breach of contract, contains no analysis to explain why a contract action should be dealt with in the same summary fashion as a private cause of action pursuant to the statute, and is not directly on point because it related to the forbearance provisions of the Farm Credit Act, rather than the more specific and mandatory restructure provisions of the Agricultural Credit Act of 1987.

The Graveleys, on the other hand, point out that the *Harper* line of cases cited above are not applicable because their claim does not depend upon creation of a private right of action to enforce the Agricultural Credit Act. They contend that they simply seek to enforce the provisions of the Act to the extent that they have been incorporated into their contract with the FCB by reference to the Act. They point out that it was the Bank which drafted the agreement and included the terms of the Act by

17

reference, and had the Bank wished to avoid judicial enforcement of the terms of the Act pursuant to the line of cases that it relies on, it could have deleted that provision from the contract. They also point out that according to the terms of the contract prepared by the FCB, the variable interest rate which has been applied to the Graveleys' loan is determined by reference to the Act and regulations of the Farm Credit Administration, and that by bringing its suit to foreclose and for a deficiency judgment, the FCB seeks to enforce at least some terms of the Act. The Graveleys argue that it would be unfair for the FCB to be able to pick and choose which terms of the contract are enforceable and which are unenforceable. The Graveleys rely, in part, on the maxim of jurisprudence which provides that "he who takes the benefit must bear the burden." Section 1-3-212, MCA.

The District Court first concluded that the contractual provision incorporating the Farm Credit Act by reference does allow the provisions of the Act to be enforced in court, and to the extent that that same reference incorporated procedural limitations from the Act which precluded access to court, those provisions were unenforceable based on Article II, Section 16, of the Montana Constitution, and § 28-2-708, MCA. Article II, Section 16, guarantees that the courts of this State will remain open to every person, and § 28-2-708, MCA, insures that legal redress may not be abridged by contract. However, after reconsideration, the District Court concluded that the constitutional and statutory authority

18

that it relied on was impliedly preempted by the procedural remedies provided for in the Act.

We reverse the order of the District Court which dismissed the Graveleys' breach of contract claim based on failure to comply with the provisions of the Agricultural Credit Act and hold that the terms of the Act were incorporated by reference in the Graveleys' contract and are as enforceable as any other contract right, including the variable interest rate which was incorporated by reference in the Graveleys' promissory note.

We further conclude that the Graveleys' right to enforce these contract provisions is not preempted by other terms of the Agricultural Credit Act.

Whether or not there is a direct private cause of action to enforce the terms of the Agricultural Credit Act of 1987 has been the subject of a good deal of judicial discussion and has been consistently decided in accordance with the Ninth Circuit Court's decision in *Harper*. The analysis has always focused on the four-part test set forth in *Cort v. Ash* (1975), 422 U.S. 66, 78, 95 S. Ct. 2080, 2087-88, 45 L. Ed. 2d 26, 37-40, for determining whether Congress intended to imply a private cause of action in a federal statute. Relying primarily on the *Harper* summary of this Act's legislative history, courts have uniformly concluded that no private cause of action was intended, even though using the full legislative history, a persuasive argument can be made to the contrary. *See Zajack v. Federal Land Bank of St. Paul* (8th Cir. 1990), 909 F.2d 1181, 1190-92 (Heaney, J., dissenting). However, it is

19

neither necessary nor appropriate that we analyze whether Congress intended to permit a private right of action to directly enforce the terms of the Agricultural Credit Act in this case.

The power of parties "to contract as they please for lawful purposes is a basic principle of our legal system . . . ." Calamari and Perillo, Law of Contracts 6 (3d ed. 1981). Furthermore, "parties are generally free by agreement to impose new duties on each other . . . ." Restatement (Second) of Contracts introductory note to topic 4, *Interference With Other Protected Interests*, Vol. II, p. 60 (1981).

A recent Montana case on point is *Mueske v. Piper, Jaffray & Hopwood* (1993), 260 Mont. 207, 859 P.2d 444. In that case, the issue was whether an arbitration clause in a brokerage firm's margin agreement was valid. We held that where the contract incorporated the rules of the National Association of Security Dealers by reference, we were bound to determine the validity of the arbitration clause in accord with those rules, regardless of whether the clause would have otherwise satisfied state and federal law. Those rules required that the customer acknowledge in writing receipt of a copy of the agreement. Since that had not been done, we affirmed the district court's invalidation of the arbitration clause. In language relevant to this case, we stated:

> As the drafter of the arbitration clause, Piper, Jaffray & Hopwood should have specified therein if it had intended to submit disputes to arbitration under the terms of the NASD and NYSE rules but did not intend to have the determination of validity of the arbitration agreement made by using the same rules. . . .
>
> . . . .

20

> Piper, Jaffray & Hopwood's arbitration clause incorporates the rules of the NYSE and NASD as controlling law. The arbitration clause does not include an exception for allowing other law to govern determinations of validity. Applying the general rules of contract interpretation set forth above, we conclude that those rules, along with the public policy considerations expressed by the SEC, direct that the validity of the arbitration clause be determined according to the incorporated controlling law -- the NYSE and the NASD rules -- unless such rules contravene the substantive law of the FAA.
>
> We hold Piper, Jaffray & Hopwood's failure to comply with the NYSE and NASD rules renders the predispute arbitration clause within Piper, Jaffray & Hopwood's Margin Agreement invalid.

*Mueske*, 859 P.2d at 449-50.

Likewise, in this case, it was the FCB which drafted the mortgage agreement so that it included the terms of the Agricultural Credit Act by reference. If the FCB had intended to allow only such enforcement of the Act's provisions as is provided for in the case law on which it relies, it could have deleted any reference to the Act or incorporated reference to the Act solely for the purpose of establishing the variable interest rate. By including reference to the Act as a controlling contract term, the FCB is bound by the terms of the Act under the contract, and the Graveleys have the same right to enforce the provisions of the Act as the parties have to enforce any other provision in the contract.

After arriving at this same conclusion, the District Court erroneously concluded that judicial enforcement of the Act as a specific contract term was preempted by federal law. However, we disagree.

21

While the existence of a private cause of action is correctly analyzed under *Cort v. Ash*, federal preemption is analyzed differently. In *State Medical Oxygen and Supply, Inc. v. American Medical Oxygen Company* (1992), 256 Mont. 38, 44, 844 P.2d 100, 104, we pointed out:

> It is well settled that state laws are presumed valid against preemption challenges unless Congress clearly intended they be preempted by federal law. *Mountain States Telephone v. Commissioner of Labor* (1979), 187 Mont. 22, 41, 608 P.2d 1047, 1057; *Cipollone v. Liggett Group, Inc.* (1992), ___ U.S. ___, 112 S.Ct. 2608, 2618, 120 L.Ed.2d 407.

We also noted the following test for analyzing federal preemption:

> A state law can be preempted by federal law in one of three ways. *K-W Industries v. National Surety Corporation* (9th Cir. 1988), 855 F.2d 640, 642 n.3. First, the federal law may expressly preempt state law; second, Congress may have intended the federal law occupy the entire field in the area; third, the state law may conflict with the federal law. *K-W Industries*, 855 F.2d at 642 n.3.

*State Medical*, 844 P.2d at 104.

The parties agree, and the District Court correctly concluded, that the Act does not expressly preempt state law other than as it pertains to usury. Therefore, our discussion will focus on whether it can be inferred from the Act that Congress intended to occupy the entire field in the area. In this part of our analysis, we must decide whether the federal law so thoroughly occupies the field of legal remedies "as to make reasonable the inference that Congress left no room for the states to supplement it." *Cipollone v. Liggett Group, Inc.* (1992), 112 S. Ct. 2608, 2617, 120 L. Ed. 2d 407, 423.

22

There is some indication in the Act itself that Congress did not intend to preempt the application of state law. 12 U.S.C. § 2214 specifically provides:

> State and other laws shall apply to corporations organized pursuant to this part [12 U.S.C. §§ 2211 et seq.] to the same extent such laws would apply to the organizing banks engaged in the same activity in the same jurisdiction: *Provided, however,* That to the extent that sections 2023, 2098, and 2134 may exempt banks or associations of the Farm Credit System from taxation, such exemptions, other than with respect to franchise taxes, shall not extend to corporations organized pursuant to this part.

The FCB points out that § 2214 pertains to service corporations, rather than a Farm Credit Bank, and therefore, is not directly applicable. However, the sole purpose of creating such a corporation is to carry out the functions of the bank and it makes little sense that Congress would intend that state law apply to the activities of a bank's agents, but that state law be preempted when the same activities are performed by the bank itself. This same view finds support in *Birbeck v. Southern New England Production Credit Ass'n* (D. Conn. 1985), 606 F. Supp. 1030. In that case, the plaintiffs executed a settlement agreement with a Production Credit Association whereby they agreed to transfer certain real estate to the PCA in lieu of foreclosure. However, after learning that the real estate was worth substantially more than they were allegedly advised by the PCA, they sued in Federal District Court to set aside the settlement agreement based on fraud, mutual mistake, and breach of the fiduciary duties owed to them by the PCA. The PCA moved to dismiss on the grounds that the plaintiffs' claims were based upon state laws which require that they proceed in state

23

court. In other words, the PCA in that case alleged that the Federal District Court lacked subject matter jurisdiction over the claims alleged. After concluding that Federal Land Banks are private corporations and not federal agencies, the District Court also concluded that there was no need for uniform federal common law regarding claims made in the Farm Credit System, and cited 12 U.S.C. § 2214 as an example of Congress's intent not to preempt claims against Federal Land Banks or Production Credit Associations. That court reasoned:

> Glaring evidence that Congress did not intend that federal law preempt the field with respect to federal land banks and production credit associations can be found in the 1980 Amendments to the Farm Credit Act, specifically 12 U.S.C. § 2214, which provides that state and other laws shall apply to service corporations organized pursuant to part D of that legislation to the same extent that such laws would apply to the organizing banks already existing under the Farm Credit System that were engaged in the same activity in the same jurisdiction. The necessary implication of section 2214 is that federal law has not preempted the field with respect to banks chartered under the Farm Credit Act and that to some degree, although unspecified in the statute, state law will control their activities.
>
> An overview of the Farm Credit Act of 1971, its associated legislative history, and its subsequent amendments (including the jurisdictional provisions regarding PCAs) indicates that other than in those areas where Congress had specifically legislated and regulated, institutions within the Farm Credit System were meant to be treated as local privately owned entities, citizens of the states in which their principal offices were located, and subject to state law.

*Birbeck*, 606 F. Supp. at 1041.

Furthermore, there is no logical basis for concluding that simply because Congress required that loan officers' decisions be reviewed by a credit review committee that it intended by that

procedure to occupy the entire field of law pertaining to restructure applications.

Based on the fact that foreclosure proceedings are traditionally based on state law, that the FCB invoked state law as the basis for its foreclosure proceedings in this case, the further fact that the Act's restructure provisions are interrelated with the lender's right to foreclosure, and based on § 2214, which is discussed above, we conclude that Congress did not intend to occupy the entire field of remedies for enforcement of borrowers' or lenders' rights under the Agricultural Credit Act of 1987. This conclusion is consistent with decisions from other jurisdictions which have held that:

> Even though the Farm Credit Act does not create a private cause of action for violation of the standards of conduct it prescribes, such conduct may give rise to a state common law cause of action. Whether a duty arises based upon breach of provisions of the Farm Credit Act is a question for the courts of the particular state.

*Interstate Production Credit Ass'n v. MacHugh* (Wash. App. 1991), 810 P.2d 535, 538 (citing *Mendel v. Production Credit Association of the Midlands* (8th Cir. 1988), 862 F.2d 180).

Finally, we must consider whether by allowing parties to incorporate the terms of the Act in their contract, and further allowing enforcement of the terms as an ordinary contract provision, a conflict with federal law would be created. We conclude that there is no conflict, but that instead, contractual enforcement of the Act's terms furthers the purpose of the federal legislation.

25

Whether we accept the FCB's argument that the Act was intended to strengthen the financial integrity of the Farm Credit System, or the Graveleys' argument that the purpose of the Act is to provide more protection for borrowers with distressed loans, we fail to see how specific enforcement of the Act's provisions through incorporation by reference in a contract would conflict with federal law. There is no basis for concluding that simply because Congress provided for a minimum procedure for reviewing a loan officer's decision that it meant to foreclose any other method of enforcing the right to restructure provided for by statute. This conclusion seems especially necessary since the credit review committee is in fact appointed by the lending institution which denied the application for restructure in the first place.

Our conclusion that there is no conflict between permitting contractual enforcement of the Graveleys' rights under the Act, and the purpose of the Agricultural Credit Act of 1987 is further supported by the plain and mandatory language of the Act itself. The Act provides that when a lender determines that a loan is distressed, the lender "shall" notify the borrower that restructuring may be suitable. 12 U.S.C. § 2202a(b)(1). The Act provides that "no lender may" foreclose a distressed loan before consideration of restructuring. 12 U.S.C. § 2202a(b)(3). It provides that a lender "shall" give the borrower a reasonable opportunity to meet personally with the lending institution. 12 U.S.C. § 2202a(c), and if the lender determines that the cost of restructuring is less than the cost of foreclosure, then the Act

26

provides that the lender "shall" restructure the loan. 12 U.S.C. § 2202a(e)(1).

Considering the nature of the language used to set forth the lender's obligations, and the detail and precision with which those obligations are established in the Act, we conclude that state contract law which permits those provisions to be enforced when included as a term of a contract by reference does not conflict with the purposes of the Federal Act.

We hold that when the terms of the Farm Credit Act of 1971, found at 12 U.S.C. §§ 2001, *et seq.*, including the restructuring provisions of the Agricultural Credit Act of 1987, found at 12 U.S.C. § 2202a, are incorporated by the parties as a term of their contract, that those provisions are as enforceable in a court of law as any other contract term. We further hold that the mere provision in the Act for review of restructuring denial by a credit review committee does not in any way express or imply a Congressional intent to limit other methods of enforcing the Act's provisions when incorporated by reference in the parties' contract.

## II
### ESTOPPEL UNDER THE ACT

Can an allegation that a Farm Credit Bank failed to comply with the restructure provisions of the Agricultural Credit Act of 1987 found at 12 U.S.C. § 2202a (1988) provide an affirmative defense to a foreclosure action by that bank?

The District Court concluded that even though there was no private cause of action to enforce the terms of the Agricultural Credit Act, and even though the Graveleys' contract cause of action

27

was preempted by federal law, the Graveleys could assert an affirmative defense to the effect that the FCB's denial of the Graveleys' restructure application was arbitrary and an abuse of discretion.

The FCB argues that such an affirmative defense should be disallowed for the same reasons that private causes of action are disallowed under the authorities previously cited. The FCB also argues that whether or not to grant a restructure application is a discretionary act by the lending institution which requires lending expertise, and that to allow review of those decisions by courts would be contrary to the purpose of the Act which, according to the FCB, was to provide financial stability to the Farm Credit System.

However, none of the authorities cited by the FCB support the argument that in an equitable foreclosure action failure to comply with the Act's restructure requirements cannot be raised as an equitable defense. In fact, in *Harper*, the seminal decision on which all other decisions denying a private cause of action are based, the Ninth Circuit Court contended that the harshness of its decision was mitigated by the opportunity for borrowers in some states to raise a lender's failure to comply with the Act as an affirmative defense. The Ninth Circuit specifically stated:

> Moreover, the argument that a private right of action must be implied or else borrowers will be without a remedy overlooks the apparent right in some states of a borrower to allege the failure to afford restructuring rights as an affirmative defense to foreclosure. *See Federal Land Bank of St. Paul v. Bosch*, 432 N.W.2d 855, 858-59 (N.D. 1988) (allowing use of 1986 regulations as an affirmative defense in state foreclosure actions); *Overboe*, 404 N.W.2d at 449 (allowing use of 1985 Act as an

28

affirmative defense in state foreclosure actions). *But see Federal Land Bank of St. Louis v. Hopmann*, 658 F.Supp. 92, 94 (E.D.Ark. 1987) (rejecting defense).

*Harper*, 878 F.2d at 1177.

The *Overboe* decision referred to by the Ninth Circuit in its *Harper* decision is *Federal Land Bank of St. Paul v. Overboe* (N.D. 1987), 404 N.W.2d 445. In that case, the Federal Land Bank of St. Paul sued to foreclose pursuant to a mortgage agreement with David and Debra Overboe. As an affirmative defense to the foreclosure action, Overboes contended that the bank did not comply with regulations of the Farm Credit Administration which required forbearance by the lender under certain circumstances. These regulations were enacted pursuant to the Farm Credit Act of 1971 found at 12 U.S.C. §§ 2001, *et seq*.

The North Dakota Supreme Court, while recognizing that federal courts have not permitted a private cause of action under the Farm Credit Act or its regulations, held that those decisions did not control "whether a qualified borrower may resist a foreclosure upon the grounds that he did not receive the forbearance called for by the regulation." *Overboe*, 404 N.W.2d at 448. In arriving at its conclusion that a lender's failure to comply with the Farm Credit Act could serve as the basis for an affirmative defense to foreclosure, the North Dakota court noted that "[a]n action to foreclose a mortgage is an equitable proceeding," and that

> although no implied private right of action may exist for damages or injunctive relief under the Farm Credit Act and regulations, courts have recognized that federal regulations which have been held to not imply a private

29

cause of action may nevertheless afford a basis for an equitable defense to a foreclosure action. [Citations omitted].

*Overboe*, 404 N.W.2d at 448.

The North Dakota court pointed out the forbearance regulation was adopted to foster agricultural development, and that "[a]llowing FLB to foreclose its mortgages without regard to the administrative forbearance regulation would be inimical to the achievement of this goal." *Overboe*, 404 N.W.2d at 449. For that reason, the court held in *Overboe* that a Federal Land Bank's failure to comply with the forbearance regulations gave rise to a valid equitable defense to a foreclosure action under state law.

However, even though it concluded that noncompliance with the Farm Credit Act and its regulations was a valid defense to a foreclosure action, that court did not conclude that a foreclosure court could substitute its judgment about whether forbearance was appropriate for that of the Federal Land Bank's loan officers. In that case, the court adopted the following standard of review when such an affirmative defense is considered:

> Thus, a trial court cannot overturn a[n] FLB loan officer's determination of a lack of borrower qualification for forbearance relief unless the borrower can prove that the Bank abused its discretion by acting in an arbitrary, capricious, unreasonable or unconscionable manner. On appeal, we will not disturb a trial court's determination on this matter unless the abuse of discretion standard of review "appears to have been misapprehended or grossly misapplied." *Universal Camera Corp. v. National Labor Relations Board*, 340 U.S. 474, 491, 71 S.Ct. 456, 466, 95 L.Ed. 456 (1951).

*Overboe*, 404 N.W.2d at 450.

30

Based upon the *Overboe* decision, the language cited from *Harper*, and our own prior decisions regarding foreclosure proceedings in courts of equity, the Federal District Courts in this state have allowed noncompliance with the restructure provisions of the Agricultural Credit Act of 1987 to be raised as an affirmative defense in each foreclosure action in which that defense has been considered. *See Debuf*, 757 F. Supp. 1106; *Farm Credit Bank of Spokane v. Parsons* (D. Mont. 1990), 758 F. Supp. 1368; *Farm Credit Bank of Spokane v. Nilsen* (D. Mont. 1990), 758 F. Supp. 1372.

In the *Parsons* case, this same Farm Credit Bank of Spokane sued to foreclose its mortgage with the defendant, Rupert Parsons. As an affirmative defense, Parsons raised the bank's failure to comply with the same restructuring provisions of the Agricultural Credit Act of 1987. The bank moved to strike that affirmative defense as a matter of law. However, after reviewing *Harper*, *Overboe*, and the nature of foreclosure actions in Montana, the Federal District Court concluded that such a defense is available in Montana. In arriving at its conclusion, the court pointed out that:

> An action to foreclose a mortgage is an action in equity. *Citizens Bank v. Duus*, 154 Mont. 18, 459 P.2d 696 (1969); *Moore v. Capital Gas Corp.*, 117 Mont. 148, 158 P.2d 302 (1945). . . .
>
> Montana recognizes the general maxim that courts of equity are governed by flexible, not cast-iron, rules which call upon the courts of equity to adapt themselves to the exigencies of the particular case. *See, Dutton v. Rocky Mountain Phosphates*, 151 Mont. 54, 438 P.2d 674 (1968). Consequently, when the jurisdiction of a court in equity is invoked for an equitable purpose, the court will properly proceed to determine any other equities existing between the parties in an effort to grant all relief

31

necessary to adjust the controversy between the parties; an undertaking designed to do complete justice. *See, Tiffany v. Uhde*, 123 Mont. 507, 216 P.2d 375 (1950); *Hames v. City of Polson*, 123 Mont. 469, 215 P.2d 950 (1950). These principles, well established in Montana, provide this court with a sufficient basis upon which to conclude the failure of the FCBS to comply with the restructuring and forbearance statutes, regulations and policies governing the activities of that entity would constitute a valid defense to a foreclosure action under Montana law. The FCBS fails to present a cogent argument to the contrary.

*Parsons*, 758 F. Supp. at 1371.

We agree with the reasoning of the Federal District Court in *Parsons* and conclude that in an action to foreclose a mortgage on property covered by the Farm Credit Act of 1971, or the Agricultural Credit Act of 1987 found at 12 U.S.C. §§ 2001, *et seq.*, an affirmative defense to the foreclosure action may be predicated upon the lender's failure to comply with the requirements of the Act.

We also agree with the decision in *Overboe*, 404 N.W.2d at 449, that adopting noncompliance with the Act as a valid defense to a foreclosure action "is not synonymous with allowing a foreclosure court to substitute its judgment for that of FLB's loan officers." Therefore, we hold that the trial court's standard of review when considering such an affirmative defense is whether the bank abused its discretion by acting in an arbitrary, capricious, unreasonable, or unconscionable manner. Furthermore, on appeal, we will not reverse the trial court unless its standard of review has been misapprehended or grossly misapplied.

Based on the trial court's appropriate standard for reviewing the restructure decision of the FCB, and based upon the affidavit

32

of Tim Watts submitted in opposition to the FCB's motion for summary judgment, we conclude that there are factual issues to be resolved in order to determine the merits of the Graveleys' affirmative defense, and therefore, affirm the District Court's denial of summary judgment which was based on that issue.

## III
## AFFIRMATIVE DEFENSE OF EQUITABLE ESTOPPEL

Can unilateral representations allegedly made by the lender and upon which a borrower relies to his detriment provide a basis for the affirmative defense of equitable estoppel to a foreclosure action when those representations are verbal and not included in the parties' written agreement?

As an additional affirmative defense to the FCB's counterclaim, the Graveleys alleged that the Bank is equitably estopped from recovering a deficiency judgment based on Valerie Warehime's representations that in the event of default the Bank would accept deeds to the secured property in lieu of foreclosure. The District Court held that sufficient evidence had been offered to raise an issue of fact regarding the defense of equitable estoppel, and partially on that basis, denied the FCB's motion for summary judgment. The District Court went on to conclude as a matter of law that if the trier of fact ultimately found the Graveleys had proven their equitable estoppel defense, then the Bank is also estopped from obtaining a security interest on the Graveleys' Home Place as a condition to granting their restructure obligation. The District Court also held that conversely if the Graveleys failed to establish the defense of equitable estoppel,

33

then their affirmative defense based on the FCB's failure to comply with the provisions of the Agricultural Credit Act will be dismissed as a matter of law because the Bank would have been justified in denying the application for restructure based on the Graveleys' refusal to provide additional collateral, whether or not the cost of restructure was less than the cost of foreclosure.

On appeal, the FCB contends that the only evidence in support of the Graveleys' equitable estoppel defense is the Graveleys' testimony regarding Valerie Warehime's oral representation, and that since those representations are superseded by the written terms of the parties' loan documents, that evidence is barred by Montana's parol evidence rule found at § 28-2-905, MCA. The FCB cites this Court's decision in *Sherrodd, Inc. v. Morrison-Knudsen Company* (1991), 249 Mont. 282, 815 P.2d 1135, for the proposition that oral negotiations which contradict the terms of the written contract are not admissible and that on this basis the District Court's order denying summary judgment should be reversed.

The Graveleys respond that reliance on the statute of frauds in this case is not applicable because it is a legal theory and the issues raised by the counterclaim and affirmative defense are equitable issues. The Graveleys further assert that neither *Sherrodd*, nor any other authorities cited by the FCB, are on point because none of them involve the issue of equitable estoppel. Finally, the Graveleys contend that to the extent that § 28-2-905, MCA, which sets forth the parol evidence rule is applicable, we should consider the defense of equitable estoppel analogous to the

34

exception for evidence of fraud which is made in § 28-2-905(2), MCA.

We conclude that the Graveleys' arguments are more persuasive, and therefore, affirm the District Court's conclusion that there was evidence to support the defense of equitable estoppel, but reverse that part of the District Court's order which held that the resolution of the estoppel issue must necessarily decide the affirmative defense based on the Agricultural Credit Act as a matter of law.

First, our decision in *Sherrodd* is not on point. In that action, a subcontractor brought a claim for damages based on oral representations by the defendant general contractor which this Court held were contrary to the express terms of the contract, and therefore, superseded by the contract pursuant to § 28-2-904, MCA. That case neither involved an equitable claim for foreclosure, nor the defense of equitable estoppel. Therefore, we conclude that our decision in *Sherrodd* does not apply to this case.

Second, it is well recognized that courts of equity will consider the statute of frauds differently than courts of law. For example, it is stated that:

> The purpose and intent of the statute of frauds is to prevent fraud, and not to aid in its perpetration, and the courts, <u>particularly courts of equity</u>, will, so far as possible, refuse to allow it to be used as a shield or cloak to protect fraud, or as an instrument whereby to perpetrate a fraud, or as a vehicle or means of culpable wrong, injustice, or oppression. [Emphasis added].

73 Am. Jur. 2d *Statute of Frauds* § 562 (1974).

35

In particular, courts have been reluctant to apply the statute of frauds to bar a claim of collateral estoppel.

> Closely allied to the principles of protection against the assertion of the statute of frauds to accomplish a fraud upon the party who has acted in reliance upon an oral contract or the assertion of the statute as a shield to protect fraud is the doctrine of estoppel to assert the statute. It is universally conceded that the doctrine of equitable estoppel may be invoked to preclude a party to a contract from asserting the unenforcibility of a contract by reason of the fact that it is not in writing as required by the statute of frauds. As is often said, the statute of frauds may be rendered inoperative by an estoppel in pais. Where one has acted to his detriment solely in reliance on an oral agreement, an estoppel may be raised to defeat the defense of the statute of frauds. This is based upon the principle established in equity, and applying in every transaction where the statute is invoked, that the statute of frauds, having been enacted for the purpose of preventing fraud, shall not be made the instrument of shielding, protecting, or aiding the party who relies upon it in the perpetration of a fraud or in the consummation of a fraudulent scheme. It is called into operation to defeat what would be an unconscionable use of the statute, and guards against the utilization of the statute as a means for defrauding innocent persons who have been induced or permitted to change their position in reliance upon oral agreements within its operation.

73 Am. Jur. 2d *Statute of Frauds* § 565 (1974).

Our prior decisions are consistent with these equitable principles. In *Fiers v. Jacobson* (1949), 123 Mont. 242, 211 P.2d 968, the plaintiff sought to enforce a provision in his lease agreement which gave him the option to purchase the property he was leasing. However, the defendant sold the land while the agreement was in effect, and when sued by the plaintiff, claimed that the plaintiff was estopped from enforcing the option because he had repeatedly told the defendant that he had no intention of exercising it. The plaintiff in that case, as does the defendant in this case, sought

36

to prohibit evidence of the oral representations based on the parol evidence rule.

In *Fiers*, this Court concluded that the evidence of the plaintiff's oral statements was insufficient to establish estoppel, however, refused to disregard that evidence based on the parol evidence rule.

Finally, we note that pursuant to § 28-2-905, MCA, which precludes evidence of oral statements when the terms of a contract have been reduced to writing, an exception is made in subparagraph (2) for evidence of fraud. The elements of fraud are substantially the same as the elements of equitable estoppel.

We have held that actual fraud includes nine elements:

    1.    A representation;

    2.    Falsity of the representation;

    3.    Materiality of the representation;

    4.    Speaker's knowledge of the falsity of the representation or ignorance of its truth;

    5.    Speaker's intent that it should be relied upon;

    6.    The hearer's ignorance of the falsity of the representation;

    7.    The hearer's reliance on the representation;

    8.    The hearer's right to rely on the representation; and

    9.    Consequent and proximate injury caused by the reliance on the representation.

*Van Ettinger v. Pappin* (1978), 180 Mont. 1, 10, 588 P.2d 988, 994.

Although organized somewhat differently, we have previously held that substantially the same elements are necessary to establish equitable estoppel. They are:

> (1) there must be conduct, acts, language or silence amounting to a representation or concealment of facts; (2) facts must be known to the party estopped at the time of his conduct; (3) truth concerning the facts must be unknown to the other party; (4) conduct must be done with the intention that it will be acted upon by the other party, or under circumstances that is both natural and probable that it will be so acted upon; (5) conduct must be relied upon by the other party; and (6) the party must in fact have acted upon it to his detriment.

*In the Matter of Shaw* (1980), 189 Mont. 310, 316-17, 615 P.2d 910, 914.

For these reasons, we conclude that the Graveleys' testimony about the representation made to them by Valerie Warehime that in the event of default the FCB would accept deeds to their secured property in lieu of foreclosure is admissible in support of the Graveleys' defense of equitable estoppel and that based on the evidence offered in support of that defense and in opposition to the FCB's motion for summary judgment, the District Court acted correctly when it denied the Bank's motion for summary judgment.

However, we note that 12 U.S.C. § 2202a(e) provides that if a lender determines "in accordance with a proposed restructuring plan" that the potential cost of restructuring is less than or equal to the potential cost of foreclosure, the lender "shall restructure the loan in accordance with the plan." We conclude from this requirement that the plan must succeed or fail on its merits, and that if the plan satisfies the "equal or less cost" requirement without providing additional collateral, then the court cannot require as a matter of law that additional collateral be

38

provided simply because the FCB requested it.  For that reason, we reverse that part of the District Court's order which held that if the Graveleys failed to prove the affirmative defense of equitable estoppel their affirmative defense based on the FCB's alleged failure to comply with the Agricultural Credit Act of 1987 also fails as a matter of law.

## IV
## RIGHT TO JURY TRIAL

Are the plaintiffs entitled to a jury trial of the issues remaining after resolution of the three previous issues?

Based on its contention that there was no claim for damages pursuant to the Agricultural Credit Act or pursuant to a breach of contract theory, the FCB took the position that the issues involved in this case were purely equitable, and therefore, moved the District Court to strike the Graveleys' demand for a jury trial. The District Court's disposition of the Bank's motion for summary judgment resulted in elimination of the Graveleys' legal claim. However, the District Court failed to act on the Bank's motion to strike the jury demand.

The Graveleys concede that if the only issues involved are equitable, they are not entitled to trial by jury.  However, they contend, and we agree, that where there are mixed legal and equitable issues (as there are based on our disposition of this case), then they are entitled to trial by jury.  In *Gray v. City of Billings* (1984), 213 Mont. 6, 689 P.2d 268, we held that the fact that equitable claims are joined with a legal claim such as breach of

39

contract does not destroy a party's right to have all legal or common issues tried by jury. We held that:

> The pleading of equitable issues and issues involving only questions of law did not destroy their rights granted plaintiffs by our Constitution and Rules of Civil Procedure. Art. II, Sec. 26, 1972 Mont. Const.; Rule 38(a), M.R.Civ.P. "[W]here equitable and legal claims are joined in the same action, there is a right to jury trial on the legal claims which must not be infringed either by trying the legal issues as incidental to equitable ones, or by a court trial of a common issue between the claims." *Ross v. Bernhard* (1970), 396 U.S. 531, 537-38, 90 S. Ct. 733, [738,] 24 L. Ed. 2d 729.

*Gray*, 689 P.2d at 272.

For these reasons, and based on our holding under Issue No. 1, we affirm the District Court's refusal to grant the FCB's motion to strike the Graveleys' demand for jury trial regarding legal issues and factual issues common to both legal and equitable claims. Factual issues related solely to equitable claims may be decided by the District Court.

The District Court is affirmed in part and reversed in part, and this case is remanded to the District Court for further proceedings consistent with this opinion.

_____
                Justice

We concur:

_____
        Chief Justice

40

_____

_____

_____
Justices

41

Justice Fred J. Weber dissents and concurs as follows:

In order to clarify my dissent, I will address the issues in a different order than in the majority opinion.

## II (as listed in majority opinion)

Can an allegation that a Farm Credit Bank failed to comply with the restructure provisions of the Agricultural Credit Act of 1987 provide an affirmative defense to a foreclosure action by that Bank?

The Agricultural Credit Act of 1987 (Act) contains an extensive array of procedures which both lenders and farmers must follow. It is true that the Act neither specifically requires nor denies judicial review of a restructuring decision by a lender. That is the critical issue before us in the present case. A review of a restructuring decision is specifically provided for in the Act by the use of the Credit Review Committee (Committee). With regard to the Committee the Act specifically provides that participation in the Committee is limited to persons who have not previously been involved in the decision on restructuring. 12 CFR §614.4442. The record does not indicate that anyone involved in the restructuring decision with the Graveleys was a part of the Credit Review Committee.

The Graveleys stated in a memorandum dated September 12, 1990, that "they were accorded their procedural rights." In other words, they were properly given the opportunity provided by the Act to question the restructuring decision and to appeal the same to the Credit Review Committee. As a result, the procedural requirements of the Act were not questioned. The Graveleys filed an amendment to their complaint in which they alleged that the Bank's denial of the

42

restructure application was contrary to provisions of the Act's attendant regulations and, as a consequence, breached the terms of the contract between the parties.

In considering the question of allowing a party to sue to enforce the Act, and its regulations it is essential to carefully consider Harper v. Federal Land Bank of Spokane (9th Cir. 1989), 878 F.2d 1172, which is the leading case on this issue and has been cited frequently by many courts throughout the United States. The Harper court concluded there was no congressional intent to create a private right of action in courts, stating:

> Even if the congressional statements are ambiguous on the creation of private right of action, our review of the administrative remedies provided by the 1987 Act convinces us that Congress intended administrative review to be the exclusive remedy. (Emphasis supplied.)

Harper, 878 F.2d at 1176; citing Middlesex County Sewage Authority v. National Sea Clammers Ass'n (1981), 453 U.S. 1, 15, 101 S.Ct. 2615, 2623-24, 69 L.Ed.2d 435. With regard to the aspect of judicial review, the Ninth Circuit Court then concluded:

> In the absence of strong indicia of a contrary congressional intent, we are compelled to conclude that Congress provided precisely the remedies it considered appropriate. (Emphasis supplied.)

Harper, 878 F.2d at 1176; citing Karahalios v. National Fed'n of Fed. Employees, Local 1263 (1989), 489 U.S. 527, 109 S.Ct. 1282, 1287, 103 L.Ed.2d 539. I will not burden the dissent with additional citations but I do point out that the great majority of cases considering the issue have adopted the Harper rationale. I conclude that we should follow the Harper rationale and hold that administrative review under the Act is the exclusive remedy

43

available to the Graveleys. Under that conclusion, the Graveleys only appeal was to the Committee.

With that background conclusion, I now consider the issue as to whether the Graveleys may provide an affirmative defense to foreclosure which consists of a claim that the Bank failed to comply with the restructure provisions. Where the parties are already before the court on cross-claim of foreclosure, I would conclude that it is appropriate to allow the Graveleys to raise such a question. But I would emphasize at this point, that the nature of the action is equitable. The legal claim of breach of contract is not permitted under the Farm Credit Act. All that is left is the lender's equitable claim of foreclosure.

I would point out that the Graveleys did have an option under the Act that they did not take; their contract called for protest to errors in valuations by having another independent appraisal done of "any interests in property securing the loan." 12 USC §2202(d)(1)(1988). The Graveleys did not even attempt to secure a second appraisal which they should have done before attempting to hire their own expert. The Act requires that the Graveleys choose from three independent appraisers whose names would be provided by the Bank. 12 USC §2202(d)(2)(1988). Had they done this, the Graveleys could have established a basis to contest errors in the Warehime worksheet. Instead, they seek to have the District Court do this.

What the Graveleys argue is that it is appropriate for the District Court to go over the Bank's worksheet for substance and

44

determine whether the Bank made a correct restructuring decision. That clearly is not the intention of the Congress under the terms of the Act. Congress prescribed a detailed set of procedures which must be followed.

I conclude the District Court could properly review the facts to determine if the procedures used under the Act have been completed by the Bank; if not, this failure can act as a defense to the lender's foreclosure action. However, I would further conclude that the Act does not provide for judicial review of the substance of the Bank's denial of the restructuring decision. The power of the District Court is limited to a determination of whether the Bank followed the proper procedures as laid out both in the extensive code and in the attendant regulations. I would therefore affirm the District Court's determination that the Farm Act and its regulations preempt other remedies by providing an exhaustive set of remedies and rights.

I

> When provisions of the Act are included by reference as terms in a mortgage agreement, can a party to the agreement sue to enforce those provisions in District Court?

As previously indicated, I have concluded that the Graveleys can sue to enforce the Act to the extent of the restructure provisions by using failure to comply with the Act as a defense to foreclosure but that is as far as the Act would allow. Once the court determines whether the lender followed procedures of the Act and its regulations I would not allow any further right of action to the Graveleys.

45

## III

Can unilateral representations allegedly made by the Bank upon which the borrower relies to its detriment, provide a basis for the affirmative defense of equitable estoppel to a foreclosure action, when the representations are verbal and not included in the parties written agreement?

Equitable estoppel is a principle of equity used to promote justice, honesty, fair dealing and to prevent injustice; the object of equitable estoppel is to prevent a party from taking advantage of his own wrong while asserting his strict legal right. Matter of Adoption of D.J.V. (1990), 244 Mont. 209, 796 P.2d 1076. Equitable estoppel is not favored and will only be sustained upon clear and convincing evidence. Berglund and Berglund, Inc. v. Contributions Bureau, Unemployment Ins. Div., Montana State Dept. of Labor and Industry (1990), 241 Mont. 49, 784 P.2d 933.

If the underlying action is one for foreclosure, the Graveleys have the right to raise an affirmative defense in an attempt to stop the foreclosure. While it seems only logical that they could raise the affirmative defense of equitable estoppel, our case law on the subject would hold the Graveleys to a high standard of proof. As the aforementioned case law indicates, the defense of equitable estoppel is not favored in the law and will only be sustained upon clear and convincing evidence. But although it may be hard to prove, the Graveleys should be given an opportunity to prove it because of the lender's cross-claim for foreclosure and because a question of fact exists. I would therefore, affirm the District Court in its refusal to grant summary judgment to the lender on this issue.

46

I would point out that the District Court's attendant determination that if the factfinder decided that the Graveleys had proven their claim of equitable estoppel, then the Bank is also estopped from obtaining a security interest on the Graveleys Home Place as a condition to granting their restructure obligation is an accurate assessment of the situation. However, the court's converse determination is not correct. Conversely the court determined that if the Graveleys failed in their quest to prove the estoppel claim, then the Graveleys affirmative defense that the lender did not comply with the regulations attendant to the Act will be dismissed as a matter of law because the Bank would have been justified in denying the application for restructure based on the Graveleys' refusal to provide additional collateral.

I find these notions only tenuously bound to each other. The majority opinion determines that the lender had no legal right to ask for collateral. I find that the Farm Act, which is what has been incorporated into the Graveleys' contract, certainly contains several references to the lender's ability to demand additional collateral. Particularly 12 U.S.C. § 2202(d)(4)(1988):

> **Additional Collateral.** An independent appraisal shall be permitted if additional collateral for a loan is <u>demanded by the qualified lender when determining whether to restructure the loan</u>. (Emphasis added.)

This is a clear indication that the majority's conclusion that the lender does not have the right to ask for additional collateral is in error.

Another section of the Farm Act prohibits foreclosure if the lender has asked for additional collateral and the borrower

47

refuses, but has made all accrued payments of principal. 12 U.S.C. 2202d (1988). Here the record shows that the Graveleys made only the first payment of principal which was due on January 1, 1985, and have failed to make any subsequent payments of principal. This also indicates that the lender can request additional collateral. The Graveleys had notice that collateral could be asked for as these provisions were part of their contract.

I concur with the majority opinion that equitable estoppel can be used as an affirmative defense, subject to the cases previously cited. I do not agree that the lender was without authority to ask for collateral.

IV

Are the plaintiffs entitled to a jury trial of
the issues remaining after resolution of the
three previous issues?

Without the contract action by the Graveleys, the underlying action in this case is foreclosure. That is an equitable action. Every defense proffered by the Graveleys is an equitable defense. Because of the equitable nature of the action and the defenses, a trial by jury is inappropriate. No equitable action can have a jury as the factfinder, it is for the court to decide.

The majority contends based upon its interpretation of the first three issues, that the case involves legal and equitable issues. I disagree because I do not interpret these issues as does the majority.

The Graveleys cannot bring an action in state court because the Act does not permit a private right of action. Thus, the only

48

action that is appropriate in the state court is the lender's cross-claim for foreclosure. The foreclosure action while appropriate in state court, is an equitable action in which no jury is permitted. Therefore, I would reverse the District Court's refusal to grant the lender's motion to strike the Graveleys' demand for jury trial.

_____
Justice

Chief Justice J. A. Turnage concurring in part and dissenting in part:

I concur with the majority opinion as to Issues I and II. However, I respectfully dissent as to Issue III, concerning the affirmative defense of equitable estoppel, and Issue IV, concerning the right to jury trial.

Section 28-2-904, MCA, provides that a contract in writing supersedes all oral negotiations or stipulations concerning its subject which preceded or accompanied execution of the written contract. Section 28-2-905, MCA, sets forth the circumstances under which extrinsic evidence concerning a written agreement may be considered. The portion claimed to be applicable in this case is subsection (2), evidence to establish fraud.

The District Court ruled, as a matter of law (and the issue was not appealed), that there was not enough evidence to support a claim of fraud on the part of FCB. The majority opinion states that "[t]he elements of fraud are substantially the same as the elements of equitable estoppel." If, as the majority states, the elements of fraud are substantially the same as the elements of equitable estoppel, what is the effect of the District Court's ruling as to the claim of fraud on the "substantially the same" claim of equitable estoppel?

Beyond that, a claim of equitable estoppel cannot be based upon a promise to do or not do a future act. Christian v. A.A. Oil Corp. (1973), 161 Mont. 420, 431, 506 P.2d 1369, 1375. Here, the alleged oral promises were not to foreclose on the "Home Place" in any future foreclosure action, and to continue providing operating

50

loans for at least five years. As promises to do or not do future acts, neither is available as a basis for a claim of equitable estoppel. The majority opinion does not address this.

Further, Attorney Lester Loble, a twenty-year partner in the Helena, Montana, firm of Loble and Pauly, P.C., and its predecessors, stated by deposition that he explored various sources of financing with Clifford Graveley prior to the Graveleys' purchase of the Snowshoe Ranch. He acted as the Graveleys' attorney in connection with the FCB loan, and was present when the FCB loan agreement was signed. He did not recall suggesting any changes to the loan document to Valarie Warehime, and, to the best of his recollection, no changes were made. At his deposition, he was asked:

Q. Do you recall any discussion by Valarie Warehime regarding [FCB] taking the collateral back and releasing Graveleys from an obligation to pay any more at the loan closing? Any discussion at the loan closing?

A. There was no such discussion at the loan closing.

. . .

Q. Were there discussions at that time before the loan closing?

A. About a deed in lieu of foreclosure?

Q. About deeds in lieu of foreclosure.

A. None whatsoever.

Q. Were there any discussions between you and your clients relative to protection of the home ranch in the event of possible default?

. . .

A. . . . The answer to that question is no.

51

Loble testified that only after the Graveleys were unable to meet their 1985 payment did he discuss with Valarie Warehime the subject of deeds in lieu of foreclosure on the Graveley loan.

There can be no misrepresentation if the party relying on the representation had the means to investigate its truth. Aetna Life Ins. Co. v. McElvain (1986), 221 Mont. 138, 148, 717 P.2d 1081, 1087. The Graveleys, and their attorney, clearly had the means to fully review the loan documents and their obligations thereunder before signing them. In addition, their attorney had both the duty and the opportunity to advise the Graveleys on these matters before they signed the loan agreement with FCB.

Hard cases make bad law. In its eagerness to come to the aid of the Graveleys, the Court here opens a wide door to variation of the terms of written contracts by alleged oral agreements. For all of the above reasons, I would grant summary judgment to Farm Credit Bank on Issue III, disallowing the equitable estoppel defense.

I also disagree with the majority's discussion under and resolution of Issue IV, Right to Jury Trial. The opinion states that "where there are mixed legal and equitable issues . . . then they are entitled to trial by jury."

The holding of the case cited, Gray v. City of Billings (1984), 213 Mont. 6, 689 P.2d 268, was that, where equitable and legal claims are joined in the same action, there is a right to jury trial on the legal claims. The Court noted that the rules permit severance of claims and issues.

The majority opinion implies that where there are both legal

52

and equitable claims, jury trial must be allowed on all claims. This was not the holding of Gray.

The question of whether juries should be allowed to decide cases both at law and in equity was specifically considered and rejected at the 1972 Montana Constitutional Convention. See Con. Con. Tr., Vol. V, pp. 1788-1792. Delegate Holland moved that Article II, Section 26 of the Montana Constitution be amended to provide that "[t]he right of trial by jury shall, in all cases in law and equity, be secured to all." Discussion ensued, in which delegates opposed to the proposed amendment pointed out the historical common law distinction between cases tried at equity and those tried at law. Following the discussion, Delegate Holland's proposed amendment was rejected. The Constitution retains the wording which was described as upholding the common law rule that there is no right to trial by jury in cases at equity.

The Montana Rules of Civil Procedure are designed to accommodate an action involving both issues triable to a jury and issues on which a jury trial is not permitted. Rule 38(b), M.R.Civ.P., speaks of demand for trial by jury "of any issue triable of right by a jury." Under Rule 42(b), M.R.Civ.P., a court may order bifurcation of trials on several issues or claims, "in furtherance of convenience or to avoid prejudice." I believe that type of procedure would be appropriate in this case. It would also be appropriate to use the provision of Rule 39(c), M.R.Civ.P., allowing a judge to empanel an advisory jury in matters not triable by jury.

In summary, the majority opinion on Issue III unnecessarily and without statutory authority or credible precedent has rendered the parol evidence rule, §§ 28-2-904 and -905, MCA, meaningless as a practical matter. In doing so, a cloud of confusion is now cast over our prior decisions interpreting and applying these statutory provisions. However, to fully appreciate the mischief created by the majority opinion, it is absolutely necessary to understand the interrelationship of Issues III and IV.

Having erroneously provided for an equitable issue of fact under Issue III, the majority opinion then concludes in Issue IV that there now exist "mixed issues" of equity and law, thereby entitling the Graveleys to a jury trial on both the equity and law issues. I am certain that the bench, bar, and the people of Montana will be startled to learn that the unambiguous language of a written contract, entered into by the Graveleys who were represented by competent attorneys, may be thus thrown into question by an alleged oral statement preceding the signing of the contract.

_____
Chief Justice

Justice Fred J. Weber joins in the dissent of Chief Justice Turnage as to Issues III and IV.

_____
Justice

54

August 12, 1994

CERTIFICATE OF SERVICE

I hereby certify that the following certified order was sent by United States mail, prepaid, to the following named:


Martin S. King, Esq.
Worden, Thane & Haines
P.O. Box 4747
Missoula, MT  59807-4747


W. Arthur Graham
Sinsheimer, Schiebelhut & Baggett
1010 Peach Street
San Luis Obispo, CA  93401

Peter Pauly
Attorney at Law
P.O. Box 176
Helena, MT  59624


Allen Beck
Attorney at Law
P.O. Box 21253
Billings, MT  59104


C. W. Leaphart
Attorney at Law
One N. Last Chance Gulch
Helena, MT  59601


Joseph M. Sullivan
Attorney at Law
608 Strain Bldg.
Great Falls, MT  59403

Larry E. Johnson
Attorney at Law
P.O. Box 2885
Great Falls, MT 59403

Hon. Ted L. Mizner
District Judge
Powell County Courthouse, 409 Missouri Ave.
Deer Lodge, MT 59722

ED SMITH
CLERK OF THE SUPREME COURT
STATE OF MONTANA

BY: _____
Deputy